IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SHERRY L. HARVEY,
Plaintiff,

v.                                              Civil Action No.  3:12cv37
                                                (The Honorable Gina M. Groh)


MICHAEL J. ASTRUE,
Commissioner of Social Security,
Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the Defendant, Commissioner of

the Social Security Administration ("Defendant," and sometimes "Commissioner"), denying the

Plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Social

Security Act.  The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of

fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P.

86.02.

## I. PROCEDURAL HISTORY

Sherry L. Harvey ("Plaintiff"), filed her application for SSI benefits on February 8, 2010,

alleging  disability since June 30, 2005,  due to lower back pain, right leg pain, nerve damage,

asthma, emphysema, and deteriorating arthritis (R. 130, 169).[1]  Her claim was denied initially and

on reconsideration (R.  71, 85).  At Plaintiff's request,  an administrative hearing was conducted by

---

[1]Plaintiff filed a prior application on May 30, 2006, also alleging disability since June 30,
2005 (R. 126).  That application was denied at the administrative level, and Plaintiff did not
appeal, and the decision became final.  Because that final decision is more than two years old, it
is not amenable to reopening, even for good cause.  20 C.F.R. Section 416.1487, *et seq.*

Daniel Cusick, Administrative Law Judge ("ALJ"), on September 8, 2011. Plaintiff, who was represented by counsel, testified, as did James Ganoe, a Vocational Expert ("VE")(R. 30).

On November 7, 2011, ALJ Daniel Cusick issued a decision finding that Plaintiff had not been under a disability, as defined in the Social Security Act, at any time during the period at issue, i.e., since January 22, 2010 (R. 15-24). On March 23, 2012, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1).

## II. FACTS

Plaintiff was born on February 28, 1973, and was thirty-eight (38) years old on the date of the ALJ's decision (R. 130). She attended high school to 11th grade, and attended college for 1½ years (R. 37). She has past work, most significantly as a telemarketer from 2004 to 2006. Prior to that she worked in the food industry, as a prep cook (R. 38-39). She testified she had to stop working at the telemarketing job due to her back problems.

Plaintiff began experiencing lower back pain in 2005. An MRI on September 9, 2005, showed a right paracentral herniated disc at the L4-5 level, with inferior migration of disc material likely affecting the L-5 nerve root on the right (R. 225). Her back pain was treated conservatively for several years. She was prescribed Lortab 7.5 mg three times per day by Dr. Sara Dilly, her treating physician at Tri County Health Clinic ("Tri County") beginning at the latest October 2006 (R. 248).

At about the same time, Plaintiff began to experience depression and anxiety, being prescribed Zoloft as of January 28, 2005, at a dose of 50 mg. (R. 261). In May 2008, she was prescribed Ambien (R. 266).

The pain medication apparently controlled Plaintiff's back pain well until approximately August 2008, when she reported to Tri County that she suffered back pain all the time (R. 268).

2

On September 17, 2008, during a routine visit at Tri County for her physical ailments, Plaintiff was diagnosed with depression for the first time (R. 271, 274). She was started on Celexa (R. 269, 271).

Sometime between September 17, 2008, and October 29, 2008, Plaintiff was involved in a fire (R. 276). She testified she was able to rescue her mother and a boarder but her grandmother died in the fire (R. 47). She took care of her mother thereafter, who was recovering from skin grafts. At that time her depression was controlled by the Celexa (R. 276).

On October 29, 2008, during another visit to Tri County, Plaintiff's chief complaint was "depression and anxiety" (R. 276). It was noted, however, that the results of an April 1, 2008, depression screening was "normal/negative" (R. 274).[2] During the October visit, she received a psychotherapy session "regarding current and past emotional difficulties using psychotherapeutic technique" (R. 276, 278). The counselor reported Plaintiff "seem[ed] to be doing well despite all these problems," and also stated she was alert and oriented, with no abnormal thought processes or apparent distress (R. 277).

By March 4, 2009, Plaintiff reported to Tri County that she had back pain and right leg pain and her hip was "going out" (R. 279).

An August 2009, MRI showed a moderate to large sized right central herniated disc which impinged on the right L5 nerve root (R. 287).

Plaintiff was examined by orthopedic surgeon Richard Douglas, MD, on September 9, 2009 (R. 369-370). He opined that she had a disc herniation at the L4-5 level with failure to respond to conservative measures. He offered her the options of a nerve root block or surgery. Plaintiff opted

---

[2]The April screening was prior to the reported fire.

for the nerve root block, but ultimately proceeded with surgery as recommended by Dr. Douglas (R. 230, 232, 290).

Plaintiff underwent a right L4-5 microlumbar discectomy with right L4-5 foraminotomy on October 2, 2009. The L5 nerve root was very taught, and several fragments were retrieved. After removal of the herniation and decompression of the right L5 nerve root, it was quite relaxed and easily mobile (R. 233-234).

Subsequent to the surgery, Plaintiff did very well with her pain. She was prescribed Celexa and Valium (R. 292). She complained of right leg pain, but her doctor noted she was doing well (R. 292-293).

On January 23, 2010, Plaintiff presented to Urgent Care, complaining of a lesion on her right foot (R. 243-244, 484). She reported having it for 10-15 years. It had been removed several times but kept returning. It was painful when walking or weight-bearing. The lesion was diagnosed as a plantar wart and she was referred to a podiatrist. She subsequently had several surgeries to remove the mass, which was unidentified after biopsy.

Plaintiff filed her current application for SSI on February 8, 2010. In her Function Report she stated that her husband helped her dress, bathe, care for her hair, and shave. She had rails installed on the toilet so she could get up and down. She sometimes prepared meals. She did a little bit of housework with her husband's help in sporadic periods. Her mother also helped with the housework. She shopped, but with others, who would do the lifting and putting away. She had no problem getting along with family, friends, or neighbors. Her condition affected many physical movements, but also her concentration and ability to complete tasks. It did not affect her ability to get along with others, use her hands, understand, remember, or follow instructions (R. 191). Her ability to pay

attention depended on her pain level. She had no problem following written or spoken instructions. She had no problem getting along with authority figures. She could handle stress "okay" and changes in routine "okay."

On March 5, 2010, Plaintiff underwent a repeat MRI, which showed some enhancing granulation tissue and/or scar posterior to the L4-5, without significant narrowing of the spinal canal. There was distortion of the soft tissues on the right side at that level consistent with a prior laminectomy. There was also a small left-sided focal disc protrusion at the L5-S1 level which caused a slight indentation of the left S1 nerve root (R. 303). Dr. Douglas did not find evidence of recurrent disc herniation (R. 303-304, 347).

On March 17, 2010, Plaintiff reported to her primary care physician that she was experiencing continuing, stabbing back pain and that Dr. Douglas was considering further surgery. She was attending physical therapy on a regular basis (R. 300). She also reported aching joints which she said she had suffered for years. She had never received treatment from a rheumatologist (R. 301).

Plaintiff attended physical therapy two to three days per week. Examination showed diminished lumbar range of motion. She also had diminished sensation in the right lower extremity with an l4, l5 dermatome at the time, although it was noted that "sometimes sensation is normal." She also showed reduced motor strength in both legs.

On April 5, 2010, Plaintiff complained to her physical therapist of soreness after riding on a four-wheeler (R. 323).

On April 16, 2010, Plaintiff reported increased hip and lumbar pain after driving to her attorney's office (R. 318). She said she was unable to walk. She walked with an antalgic gait but

was able to correct it with verbal cues from the therapist.

On April 26, 2010, Plaintiff reported an increase of lower back pain after she had to "pin down her 95-pound son because she thought he was going to hurt somebody" (R. 336).

On May 6, 2010, Plaintiff's physical therapist reported: "Patient would have difficulty performing jobs involving standing, walking, lifting, carrying items due to low back pain and symptoms; however, would probably be able to sit for work activity" (R. 317).

On June 15, 2010, Plaintiff reported to the State agency that she had trouble concentrating at times. Her mind "went in seven to nine different directions at times" (R. 340). She indicated she had been diagnosed with ADHD as a child and took Ritalin until she developed an allergic reaction to it. She had not been diagnosed with ADHD as an adult (R. 340). She said she was going to start counseling.

On June 23, 2010, Dr. Douglas indicated that the repeat MRI in March 2010 revealed postoperative changes, epidural fibrosis on the right at L4-5, and recurrent disc herniation (R. 341-342). He noted that Plaintiff's right leg symptoms were not as bad as they were prior to the surgery. He opined:

> I believe since her last gainful employment was four years ago, she has a zero percent change of returning to gainful employment and because of her persistent pain syndrome including having a right L4-L5 microlumbar discecbody that she will not be able to work in the future and have gainful employment, therefore, I support her efforts in trying to ascertain, with her attorney from Charleston, her disability.

(R. 341-342).

On June 28, 2010, Plaintiff was examined by psychologist Morgan Morgan, at the request of the State agency (R. 383). Mr. Morgan noted that Plaintiff's posture was rigid and she moved slowly with a limp. She was initially irritable, but became more cheerful as the evaluation

6

continued.

Plaintiff described her mood as "mellow," although reporting past recurrent depressive episodes. She said she often worried over problems and had a history of anxiety symptoms. She said she struggled with attention and concentration, and during her younger years, struggled with anger control. She was argumentative. She was having trouble with sleep due to ruminations over stressors. Her appetite was adequate and she was not experiencing any weight fluctuations. She reported occasional crying spells. She reported her energy level as "low," although that was not congruent with her personality during the exam.

Mr. Morgan found Plaintiff was cooperative and compliant and her eye contact was good. She was very talkative and "often overly familiar." She tended to be rather verbose, although her speech was relevant and coherent, and at a normal pace. She was fully oriented. Her affect was broad. She did not display any psychosis, although her statements did suggest idiosyncratic beliefs.[3] Mr. Morgan described her as notably "characterological."[4] She displayed "unique" personality factors. He opined her insights were severely deficient. Her judgment was seemed to be normal. Her immediate and remote recall were both normal, but her recent recall was moderately deficient. Her concentration was mildly deficient. Her overall social functioning was moderately deficient.

Mr. Morgan diagnosed Plaintiff with anxiety disorder, NOS and pain disorder associated with both psychological factors and a general medical condition. He also diagnosed histrionic

---

[3] Idiosyncratic–A habit of body or mind peculiar to an individual. Dorland's Illustrated Medical Dictionary, (32d ed. 2012).

[4] A type of self-blame associated with a belief in personal deservingness (non-modifiable) for past negative outcomes instead of attributing them to one's behavior (modifiable). www.ncbi.nlm.nih.gov (Accessed on January 30, 2013)

personality features. Her social functioning was deemed to be moderately deficient. Her concentration was deemed mildly deficient based on testing. Her persistence was deemed moderately deficient as was her pace. Her prognosis was "poor." (R. 384-385).

On July 6, 2010, Plaintiff presented to Family & Medical Counseling Center for an Intake Evaluation (R. 485). She complained of hyper-activity, sleep difficulties, irritability, feelings of anxiety or panic, lack of appetite, and depression. Her stated reason for the visit was "Just expression and be able to talk and work threw [sic] some issues." She said she was getting more depressed and overwhelmed. The counselor noted Plaintiff was experiencing significant family disputes. Plaintiff was a no-show for two subsequent scheduled counseling appointments (R. 486).

On July 31, 2010, State agency reviewing psychiatrist Dr. James Binder reviewed Plaintiff's file and completed a Mental Residual Functional Capacity Assessment ("MRFC") (R. 401). He indicated Plaintiff would be moderately limited in social functioning and moderately limited in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. He found only mild difficulties in maintaining concentration, persistence or pace (R. 401). He found her not significantly limited in memory, concentration, persistence, or adaptation. He found she would be capable of learning and performing basic work-like tasks.

Also on July 31, 2010, State agency physician Dr. Fulvio Franyutti completed a physical RFC assessment, in which he indicated Plaintiff could perform work at the light exertional level (R. 410). He noted that Plaintiff's allegations were partially supported by the medical evidence, and opined that her statements concerning the severity of her symptoms were only partially credible. He opined that the medical evidence was not consistent with the questionnaires wherein Plaintiff indicated

restrictions to her daily activities due to pain (R. 414). He found she was capable of lifting 20 pounds occasionally and 10 pounds frequently. She was able to sit, and stand/walk for 6 hours each in an 8-hour workday. She had no visual, manipulative or communicative limitations, but did have some postural and environmental limitations (R. 411-413).

Dr. Douglas ordered a repeat MRI on August 8, 2010. He determined it showed scar formation surrounding the passing right L5 root and a recurrent disc herniation on the right at L4-L5 that was not present on the March 2010 MRI. She was scheduled to see Dr. Fahim to try some transforaminal right L5 nerve root blocks, but she said she would rather proceed with surgery. She was also to undergo some nasal fracture repair. Dr. Douglas noted Plaintiff exhibited recurrent radicular symptoms and ordered another MRI to determine if re-operation was warranted (R. 435, 484).

On April 6, 2011, Dr. Douglas noted that five to six months earlier Plaintiff had surgery to repair a fractured nose, and then several months ago had surgery on the sole of her right foot to have a mass removed. She was still wearing a modified shoe for that healing process. Dr. Douglas diagnosed recurrent radicular symptoms post right L4-5 discectomy, with recurrent radicular symptoms for the past year. He scheduled another MRI to prepare for repeat lumbar discectomy (R. 484).

On August 11, 2010, Plaintiff presented to rheumatologist Shelly Kafka, on referral from Tri County for her complaints of polyarthralgias (R. 420). Plaintiff told Dr. Kafka she had complaints of joint pain since age 13, but had never been to a rheumatologist (R, 417, 419). She appeared to be in no acute distress. Dr. Kafka found Plaintiff suffered from polyarthralgia with a positive ANA test. She recommended further evaluation to exclude an underlying connective tissue disease (R.

420).

Dr. Kafka ordered X-Rays which showed mild degenerative joint disease described as early changes of osteoarthritis in both feet, and mild degenerative changes diagnosed as osteoarthritis of both hands and both wrists (R. 430-433).

On March 25, 2011, Plaintiff reported to Dr. Douglas that she had been experiencing recurrent radicular symptoms for the past year. She had been taking Voltaren, a nonsteroidal anti-inflammatory medication for the previous year without significant relief. Dr. Douglas ordered another MRI.

Plaintiff underwent her fifth MRI of the lumbar spine on August 20, 2011, which showed a large disc herniation at L4-L5 centrally and to the right with inferior migration of an extruded fragment (R. 517).

At the Administrative Hearing, held on September 8, 2011, Plaintiff testified she lived with her husband and two children, ages 11 and 13 (R. 37). She could walk about 20 minutes at a time, and could stand 10-15 minutes at a time. She socialized with family and friends every day by phone, email, or in person (R. 49). She usually left the house only to pick up her husband from work or to pick up her children from school. She testified it was 38 miles round-trip to her children's school (about 35 or 40 miles), and that when she got home she was "ready to take her medicine" (R. 49-50). It was subsequently noted that Plaintiff had only had to drive the children to school for a few weeks at the beginning of the school year. By the time of the hearing, only weeks since the beginning of school, the children were provided a bus. Her husband had been back to work only the last two weeks, having been unemployed for about a year. She tried to do laundry every day, or pick up the house or dust. She sometimes cooked– her husband did the cooking if she was hurting or couldn't

10

stand. He did the vacuuming, dishes, "whatever she needed." She and he went shopping together and she rode in an electric scooter at the store.

On a typical day Plaintiff would get up put a pot of coffee on for her husband, then "holler" for the children to get up. They would get up, shower, and get dressed themselves. They were ready for the school bus by 6:45. She would then wake her husband and go back to sleep for a couple of hours (R. 51). When she awakened she might watch television, and take something out to thaw for dinner. Her medications made her sleepy. She testified her husband helped her dress.

The ALJ asked the Vocational Expert if there would be any jobs available in the national economy for a person with Plaintiff's educational and work background and age, who would be able to work at the light level, stand or walk for approximately 6 hours per 8 hour workday, sit six hours in an 8-hour workday, with only occasional climbing ramps or stairs but never climbing ladders, ropes or scaffolds. The person could occasionally balance, stoop, kneel, crouch and crawl. She must avoid concentrated exposure to extreme temperatures, vibration, fumes, odors, dust, and gases, and all work place hazards. The work must be limited to simple, routine and repetitive tasks involving simple work related decisions with few, if any workplace changes. Only occasional interaction with the public and only occasional supervision. The VE responded the person could work as a price marker or a mail clerk (R. 60). There would also be jobs available with the same limitations at the sedentary level, including bench worker and addresser/stuffer.

If the same person could only walk or stand 20 minutes each hour, could only lift four or five pounds occasionally, and would not be able to climb, balance, stoop, kneel, crouch or crawl, there would be no work (R. 61).

The ALJ was aware Plaintiff was scheduled for an appointment with Dr. Douglas shortly

after the hearing, and left the record open for submission of additional evidence.

On September 13, 2011, Dr. Douglas opined that a disc fragment was significantly compressing the right L5 nerve root (R. 524). He reported Plaintiff's pain had been progressive to the right gluteal, thigh, to the posterior calf, to her ankle. He opined: "This is fairly constant and her symptoms increase with lifting, bending, walking up stairs and decrease with sitting with her feet propped up and electric stimulation." He also reported that the recent MRI showed an increase in the size of the herniated disc with caudal migration of the disc fragment compressing the right L5 nerve root significantly (R. 524).

On September 21, 2011, Dr. Douglas performed a second discectomy to address Plaintiff's recurrent disc herniation (R. 520-521). He found a very large recurrent disc herniation. Multiple fragments were removed, especially a large one that had migrated caudally to the level of the pedicle on the right at L5. After removal of the disc, the right L5 nerve root became relaxed and mobile.

## III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Cusick made the following findings:

1.  The claimant has not engaged in substantial gainful activity at any time since the January 22, 2010, date upon which she most recently applied for Supplemental Security Income, i.e., the "period at issue" herein (20 CFR 416.920(b) and 416.971 *et seq.*).

2.  During the period at issue, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited her ability to perform basic work activities for a period of at least 12 consecutive months: degenerative disc disease of the lumbar spine, status post right L4-5 microlumbar discectomy (October 2009) and right L4-5 reoperative microlumbar discectomy (September 2011); polyarthralgia with positive antinuclear antibodies (ANA) with no titer and normal rheumatoid factor; asthma, with history of

concurrent tobacco abuse; gastroesophageal reflux disease; residual effects, status post excision of skin mass (foot); obesity; depression, by history; anxiety related disorder; pain disorder associated with both psychological factors and a general medical condition; and histrionic personality features (20 CFR 416.920(c)).

3. During the period at issue, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have presented symptoms sufficient to meet or medically equal the severity criteria for any impairment listed in Appendix 1, Subpart P, Regulation No. 4 (20 CFR 416.920(d), 416.925 and 416.926).

4. Throughout the period at issue, the claimant has had at least the residual functional capacity to perform a range of work activity that: requires no more than a "sedentary" level of physical exertion; requires no climbing of ladders, ropes or scaffolds, and no more than occasional performance of other postural movements (i.e., balancing, climbing ramps, stairs, crouching, crawling, kneeling and stooping); entails no concentrated exposure to temperature extremes, vibration or airborne respiratory irritants/environmental pollutants (e.g., chemicals, dust, fumes, gases, noxious odors, smoke), and no exposure to hazards (e.g., dangerous moving machinery, unprotected heights); consists of or entails only simple, routine and repetitive tasks and decisions, and presents few, if any changes (e.g., as to setting duties, coworkers); and requires no more than occasional interaction with others (20 CFR section 416.920(e)).

5. Throughout the period at issue, the claimant has lacked the ability to fully perform the requirements of any "vocationally relevant" past work (20 CFR 416.965).

6. The claimant throughout the period at issue is appropriately considered for decisional purposes as a "younger individual age 18-44" (20 CFR 416.963).

7. The claimant has attained more than a "high school" education and is able to communicate in English (20 CFR 416.964).

8. The claimant has acquired no particular work skills that are transferable to any job that has remained within her residual functional capacity to perform during the period at issue (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and prescribed residual functional capacity, she has remained capable throughout the period at issue of performing jobs that exist in significant numbers within the

national economy (20 CFR 416.960(c) and 416.966).

10.  The claimant has not been under a disability, as defined in the Social Security
     Act, at any time during the period at issue herein i.e., since January 22, 2010
     (20 CFR 416.920(g).

(R. 15-24).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions

Plaintiff contends the findings of the ALJ that there are jobs in significant numbers that she can perform, and a capacity for performing a limited range of sedentary exertion is not supported by substantial evidence. Plaintiff in particular argues:

1.  The ALJ's hypothetical question to the VE did not include all of Plaintiff's limitations.

14

2.  The ALJ's finding concerning Plaintiff's RFC is not the same as the limitations in his hypothetical to the VE.

3.  The ALJ's credibility finding is not supported by substantial evidence.

4.  The ALJ's findings regarding Plaintiff's mental limitations are not supported by substantial evidence.

Defendant contends substantial evidence supports the Commissioner's determination. In particular, Defendant argues:

1.  The ALJ properly instructed the VE concerning Plaintiff's limitations.

2.  The wording of the hypothetical fairly reflected all the ALJ's RFC findings concerning Plaintiff's social limitations.

3.  The ALJ's credibility finding was supported by substantial evidence.

4.  The ALJ appropriately considered the medical opinions on mental limitations.

### C.  Mental Limitations

Plaintiff first argues that the ALJ's hypothetical to the VE did not include all of her limitations, most notably because the ALJ's Residual Functional Capacity finding is not the same as the limitations the ALJ included in the hypothetical to the VE. In Koonce v. Apfel, 166 F.3d 1209 (4th Cir 1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record.

In his Decision, the ALJ found Plaintiff had the RFC to perform work which, besides physical limitations: "consists of or entails only simple, routine and repetitive tasks and decisions, and presents few, if any changes (e.g., as to setting, duties, coworkers); and requires no more than occasional interaction with others." (R. 20)(Emphasis added).

In his hypothetical to the VE, in addition to physical limitations, the ALJ limited Plaintiff to "simple, routine and repetitive tasks involving simple work related decisions with few, if any, workplace changes. Only occasional interaction <u>with the public and only occasional supervision</u>." (Emphasis added). The VE responded the person could work as a price marker or a mail clerk (R. 60). There would also be jobs available with the same limitations at the sedentary level.

Simply put, the RFC requires no more than occasional interaction "with others," while the hypothetical required no more than occasional interaction only with the public and only occasional supervision. The two are clearly inconsistent. Plaintiff contends the limitation "with others" necessarily includes co-workers, which the ALJ did not address in the hypothetical. Defendant contends "it can be reasonably implied that such a limitation with the public and supervisors would extend to coworkers." The undersigned does not agree. Defendant cites to no rule, regulation or case in support of his proposition and the undersigned could find none. Instead, as Plaintiff points out in her Reply, the Commissioner himself addresses separately a claimant's ability to interact with the public, with coworkers, and with supervisors on the Mental Residual Capacity form. Limitations under "C. SOCIAL INTERACTION" on the form include:

12.    The ability to interact appropriately with the <u>general public</u>.

. . . .

14.    The ability to accept instructions and respond appropriately to criticism <u>from supervisors</u>.

15.    The ability to get along with <u>coworkers or peers</u> without distracting them or exhibiting behavioral extremes.

Form SSA-4734-F4-Sup(02-2008)(Emphasis added). Each numbered mental activity is followed

by a box to be checked as to whether the evaluator opines the claimant's ability in that area is "Not

Significantly Limited," "Moderately Limited," "Markedly Limited," "No Evidence of Limitation in

this Category," or "Not Rateable on Available Evidence."   Clearly, an ability or lack thereof in

interacting with one or two of these groups does not "imply" the same for any other group.

Second, a limitation on "interaction with others" is much broader than a limitation on

interaction with the public and supervisors.  The undersigned finds the word "others" in this context

necessarily includes co-workers.  The ALJ's hypothetical to the VE did not use the broader term

"others" but was instead limited to only occasional interaction with the public and only occasional

supervision.  It is quite possible to envision a work environment which included virtually no

interaction with the public and only occasional supervision, yet entailed quite a bit of interaction with

coworkers.

The error is further cause for concern because the ALJ included in his list of Plaintiff's severe

impairments "histrionic personality features," a finding made by psychologist Morgan Morgan under

Axis II.  According to the DSM-IV, Axis II is used "to indicate prominent maladaptive personality

features that do not meet the threshold for a Personality Disorder."[5]  In other words, psychologist

Morgan, and the ALJ himself, found Plaintiff had "prominent maladaptive personality features of

a histrionic personality disorder."   The essential feature of a Histrionic Personality Disorder is

"pervasive and excessive emotionality and attention-seeking behavior."  DSM IV continues:

> Individuals with Histrionic Personality Disorder are uncomfortable or feel
> unappreciated when they are not the center of attention.  Often lively and dramatic,
> they tend to draw attention to themselves and may initially charm new acquaintances
> by their enthusiasm, apparent openness or flirtatiousness . . . . This need is often
> apparent in their behavior with a clinician (e.g., flattery, bringing gifts, providing

---

[5]Diagnostic and Statistical Manual of Mental Disorders, p. 27  (4th ed. 1994).

dramatic descriptions of physical and psychological symptoms that are replaced by new symptoms each visit). The appearance and behavior of individuals with this disorder are often inappropriately sexually provocative or seductive. This behavior is directed not only toward persons in whom the individual has a sexual or romantic interest, but occurs in a wide variety of social, occupational, and professional relationships beyond what is appropriate for the social context. . . . . Individuals with this disorder are characterized by self-dramatization, theatricality, and an exaggerated expression of emotion. They may embarrass friends and acquaintances with excessive ardor, sobbing uncontrollably on minor sentimental occasions, or having temper tantrums. . . . . Individuals with this disorder often consider relationships more intimate than they actually are . . . . referring to physicians met only once or twice under professional circumstances by their first names.

The undersigned notes again that Mr. Morgan did not diagnose Plaintiff with a Histrionic Personality Disorder, only with having "prominent maladaptive personality features of a histrionic personality disorder." The ALJ adopted this finding as a severe impairment. In support of this opinion, Mr. Morgan, who met Plaintiff only the one time, observed she was "very talkative, and often overly familiar." She tended to be "rather verbose." Her statements suggested idiosyncratic beliefs. Mr. Morgan concluded: "Overall, the client's presentation was rather characterological." She displayed "unique personality factors." Her insights were severely deficient. Mr. Morgan reiterated that she was "often overly familiar." These observations by an examining psychologist support a finding that Plaintiff may have a limited "ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes." MRFC at No.15. The undersigned cannot find that the ALJ's limitation of interaction with supervisors and the public implies a limitation on her ability to interact with coworkers. Further, the evidence supports a finding that there should be a limitation to some degree of her interaction with co-workers.

Plaintiff further argues that the ALJ's consideration of her mental limitations is insufficient, in particular because examining psychologist Morgan found her persistence and pace moderately deficient, and the ALJ simply limited her to performing "simple, routine work with reduced

18

interpersonal demand." In doing so, the ALJ expressly stated he "credited the diagnoses and [sic] of Morgan D. Morgan, M.A. and the conclusions of the State Agency psychological consultant (Exhibits 14F, 16F, and 17F)." There are two problems with this statement, however. First, Mr. Morgan and Dr. Binder had differing opinions as to Plaintiff's limitations. Dr. Binder opined Plaintiff would have only mild limitations of concentration, persistence or pace, while Mr. Morgan found she would have a mild limitation on her concentration, but moderate limitations of persistence or pace. Although crediting both in his RFC, the ALJ did not mention concentration, persistence or pace except at Step Two of the sequential evaluation, where he found her limitations in all three areas was mild. In doing so, he accorded Dr. Binder significant weight.

The ALJ never discussed Mr. Morgan's evaluation or discussed the weight he gave his opinions. 20 C.F.R. § 404.1527 states:

> (c) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion
>
> > (1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
> >
> > (2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and

severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) *Specialization.* We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) *Other factors.* When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

In <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235 (4th Cir. 1984), the Fourth Circuit stated:

> We cannot determine if findings are supported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. <u>See</u>, <u>e.g.</u>, <u>Myers v. Califano</u>, 611 F.2d 980, 983 (4th Cir. 1980); <u>Stawls v. Califano</u>, 596 F.2d 1209, 1213 (4th Cir. 1979); <u>Arnold v. Secretary</u>, 567 F.2d 258, 259 (4th Cir. 1977). As we said in <u>Arnold</u>: The courts . . . face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all the evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." 567 F.2d at 259. Neither the ALJ nor the Appeals Council indicated the weight given to the various medical reports submitted by the appellant. We therefore remand to the district court with instructions further to remand the case to the Secretary with directions to the Secretary to reconsider the case and to indicate explicitly the weight accorded to the various medical reports in the record.

Here, the ALJ did not indicate the weight, if any, he gave to Mr. Morgan's report. The case should be remanded for that reason alone, consistent with <u>Gordon</u>. Further, while crediting his

diagnoses of anxiety disorder, pain disorder, and histrionic features, the ALJ then did not credit Mr.

Morgan's opinion regarding Plaintiff's persistence and pace, without indicating his reasoning. In

fact, he does not mention Mr. Morgan's opinion in that regard. The undersigned finds substantial

evidence therefore does not support the ALJ's finding that Plaintiff's limitations of concentration,

persistence or pace were all mild.

Further, based on his finding, the ALJ did not include any limitations on persistence or pace

in his hypothetical to the VE. Substantial evidence therefore does not support the ALJ's reliance on

the testimony of the VE in response to the hypothetical.

### D. Credibility

Plaintiff next argues that the ALJ's credibility finding was not supported by substantial

evidence, and his RFC therefore also lacked substantial evidence. Defendant contends the ALJ's

credibility finding is supported by substantial evidence. The Fourth Circuit has developed a two-step

process for determination of whether a person is disabled by pain or other symptoms as announced

in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically
> determinable impairment which could reasonably be expected to cause not just pain,
> or some pain, or pain of some kind or severity, but *the pain the claimant alleges she
> suffers*. The regulation thus requires at the threshold a showing by objective
> evidence of the existence of a medical impairment "which could reasonably be
> expected to produce the actual pain, in the amount and degree, alleged by the
> claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A)
> requires "objective medical evidence of some condition that could reasonably be
> expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective
> medical evidence a medical impairment reasonably likely to cause the pain claimed,
> *that the intensity and persistence of the claimant's pain, and the extent to which it
> affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) &
> 404.1529(c)(1). Under the regulations, this evaluation must take into account not
> only the claimant's statements about her pain, but also "all the available evidence,"

including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

The ALJ found that Plaintiff had medically determinable impairments during the period at issue that could reasonably be expected to produce some of the symptoms that she has alleged. She therefore met the first, threshold step of Craig, and the ALJ was required to take into account all the available evidence relevant to the severity of her medically-determinable impairments. As to the second step, the ALJ first stated, "the claimant's September 2011 hearing testimony and other attributed statements of record concerning the intensity, persistence and limiting effects of her impairment-related symptoms throughout such period are not entirely credible." (R. 21).

The ALJ based his credibility finding in large part on Plaintiff's reported daily activities, stating:

> However, she has remained relatively active and functional within her household, which renders her underlying credibility at least somewhat suspect, given the severity of her subjective pain complaints (i.e., "10 of 10 severity) despite her use of long-term opiate medication (including Percocet and Norco) that she has reported "stops the pain" (Exhibits 4E/6 and 10E/5). As indicated above, the claimant reports that she sees that her children are clean, dressed and get to school (Exhibit 6E/2). She testified that she was able to drive 38 miles round trip to pick up her children from school and that she had also picked her husband up when he was working. She reports that she does some household chores, socializes daily and goes shopping.

(R. 21).

The Exhibit to which the ALJ refers in particular is Plaintiff's Function Report of April, 2010. She did check the "Yes" box indicating she cared for her children, explaining she made sure

23

they got to school, and made sure they were clean, fed, and dressed; however, the children were approximately aged 9 and 11,[6] and her husband helped with them. Where asked about her ability to take care of her own personal needs, she responded her husband helped her dress, bathe, care for her hair, and shave.[7] She could feed herself "okay," and used the toilet without help, but "had to have rails installed on toilet to get on/off." (R. 187). She stated she prepared her own meals "sometimes," prepared food or meals "one time daily," and it took her "20-30 minutes & I have to sit while doing it." (R. 188). She stated she did "a little bit of housework with husband's help & in sporadic periods;" that how often she did so and how long it took "depended on pain level;" and that her mother also helped with housework (R. 188). She went outside only to go to physical therapy. She did shop for groceries, household items, and medication, but had to have people in the store do all the lifting, then her husband got the items out of the car and put them away. Under "Social Activities" she reported she talked to friends and family on the phone daily.

In her report dated September 2010, Plaintiff reported she needed assistance to bathe and get dressed. Her husband helped her bathe every other day or so. She used a bath chair. She needed help getting out of bed and only got out of bed a couple days a week. She needed assistance with all housework. (R. 211).

At the hearing in August, 2011, Plaintiff testified she could walk about 20 minutes at a time and could stand 10-15 minutes at a time. Where asked if she had family and friend that she talked with "in person, meet, you know, talk over the phone, email, chat with . . . " she answered, "Yeah,

---

[6]The undersigned disagrees with Defendant's contention that Plaintiff "car[ed] for two young children."

[7]Defendant's contention that Plaintiff was "independent with self-care" is not supported by the record.

I socialize with, yes . . . .every day probably."   She usually left the house only to pick up her husband from work tor to pick up her children from school (it was, indeed, 38 miles round-trip to the school; however, she had only had to do this a few weeks before the children could ride the bus, which they were doing by the time of the hearing). She "tried" to do laundry every day, or pick up the house. She sometimes cooked. Her husband usually cooked, and also did the vacuuming, dishes, or "whatever she needed." They went shopping together, and she rode in an electric cart.   Her husband helped her to dress.   As regards caring for her children, she testified she "holler[ed]" to wake them up, but then they got up, dressed, took showers, brushed their hair and got ready for school themselves.   She made sure the were out of the house in time to catch their bus.

Importantly, the ALJ did not find that Plaintiff's actual reports of her activities were not credible.   Instead, he found that her reported activities indicated she was "relatively active and functional within her household."   The undersigned finds little support for this conclusion in the record.

The ALJ also relies on the July 2010 opinion of State Agency reviewing physician Fulvio Franyutti that Plaintiff remained capable of performing a significant range of "Light" exertional work activity (R. 19).   Dr. Franyutti had available to him records only up until July 2010, weeks before Dr. Douglas determined a new MRI showed a recurrent disc herniation.   Subsequent to Dr. Franyutti's opinion, Plaintiff was also diagnosed with polyarthralgia, and early osteoarthritis of both feet and both hands and wrists.   By the time of the ALJ's decision, more than a year after Dr. Franyutti's opinion, Plaintiff had been diagnosed by her treating specialist, through repeat MRI's, with a recurrent, larger disc herniation, with a large fragment significantly impinging on the nerve root, and had had a repeat discectomy.

The undersigned further notes that, although the ALJ specifically found Plaintiff had a severe pain disorder with both psychological factors and a general medical condition, he did not address the results that mental disorder may have on her credibility regarding pain and functional limitations. Diagnostic and Statistical Manual of Mental Disorders, 458 ("DSM-IV") (4th ed.1994) provides as follows:

> The essential feature of Pain Disorder is pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention. The pain causes significant distress or impairment in social, occupation, or other important areas of functioning. Psychological factors are judged to play a significant role in the onset, severity, exacerbation, or maintenance of the pain. The pain is not intentionally produced or feigned as in Factitious Disorder or Malingering. Pain Disorder is not diagnosed if the pain is better accounted for by a Mood, Anxiety, or Psychotic Disorder. Examples of impairment resulting from the pain include inability to work or attend school, frequent use of the health care system, the pain becoming a major focus of the individual's life, substantial use of medications, and relational problems such as marital discord and disruption of the family's normal lifestyle.

In particular Pain Disorder Associated with Both Psychological Factors and a General Medical Condition is used when both psychological factors and a general medical condition are judged to have important roles in the onset, severity, exacerbation, or maintenance of the pain. Id. The ALJ did not address this severe impairment and any impact it may have had, in particular on her credibility.

Based on all of the above, the undersigned finds substantial evidence does not support the ALJ's credibility finding.

## V. RECOMMENDED DECISION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's application for SSI. I accordingly recommend

Defendant's Motion for Summary Judgment [D.E.16] be **DENIED**, and Plaintiff's Motion for Summary Judgment [D.E.14] be **GRANTED in part**, by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Gina M. Groh, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this __/ /__ day of February, 2013.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE